IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

KARDELL V. ELLIS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JACKSON KARDELL, APPELLEE,

V.

LAURA ELLIS, APPELLANT.

Filed February 25, 2020.    No. A-18-946.

Appeal from the District Court for Douglas County: SHELLY R. STRATMAN, Judge. Affirmed.

Steven G. Ranum, of Croker, Huck, Kasher, DeWitt, Anderson & Gonderinger, L.L.C., for appellant.

Michael D. Sands, of Baird Holm, L.L.P., for appellee.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Laura Ellis (Laura) appeals the Douglas County District Court's order granting summary judgment in favor of Jackson Kardell in this quiet title action. We affirm.

## II. BACKGROUND

On September 30, 2009, Laura and Jackson (who were in a relationship at the time) entered into a "Security Land Contract" (Land Contract) with Laura's father, Jeffrey Ellis (Jeffrey). Pursuant to the Land Contract, Jeffrey agreed to sell a residential property located in Omaha, Nebraska, to Laura and Jackson, as tenants in common, for $79,200. Laura and Jackson were to pay the purchase price in equal monthly installments of $660 commencing October 1, 2009, with the last installment being due on September 30, 2019. The Land Contract further provided that

- 1 -

"[t]he [Warranty] Deed [conveying to the Purchaser fee simple title to the Property] shall be executed concurrently with the execution of this Agreement and placed in the possession and safe keeping of the Seller pending payment in full of this contract." And, "Possession of the Property shall be delivered to the Purchaser on . . . the date of this contract. The Seller's interest in the Property is security for the payment of the balance of the Purchase Price owed by the Purchaser." The Land Contract was recorded with the Douglas County Register of Deeds on October 28, 2009. We note that although the Land Contract stated that a Warranty Deed would be executed concurrently with the Land Contract, it was not.

Subsequent to the execution of the Land Contract, Laura and Jackson ended their romantic relationship. In 2011, prior to full performance of the Land Contract, they decided to take up separate residences. On October 12, Laura and Jackson signed an "Acknowledgment of Separation and Quitclaim" which stated in relevant part:

> Laura and Jackson agree that Jackson will continue to reside at [the residential property], and that Laura, in consideration of ONE DOLLAR ($1.00) and other valuable consideration, receipt of which is hereby confirmed, is executing a quitclaim deed conveying and transferring whatever rights and interest she possesses in the [residential] property to Jackson.

Laura and Jackson both acknowledge that Jackson had paid Laura $10,000 as of October 12 to buy out her interest in the residential property; Laura gave deposition testimony that she had put $18,000 to $20,000 into the property and that Jackson agreed to pay her $10,000 prior to or at the time the deed was executed, and then another $5,000 in "the next couple years" to buy her out. We note that as of October 1, 2011, 25 installments of $660--a total of $16,500--would have been paid to Jeffrey on the Land Contract. Also on October 12, Laura executed a "Quitclaim Deed" conveying and transferring the residential property to Jackson; this Quitclaim Deed was recorded with the Douglas County Register of Deeds on October 17.

Jackson subsequently continued to make monthly payments to Jeffrey pursuant to the Land Contract. On May 31, 2017, Jackson paid the remaining balance of the purchase price under the Land Contract ($18,480). On June 22, Jeffrey signed the Warranty Deed conveying the residential property to Jackson and Laura, as tenants in common; the Warranty Deed was recorded with the Douglas County Register of Deeds on July 6.

On July 10, 2017, Jackson filed a complaint against Laura and Jeffrey. The complaint contained a quiet title action against Laura wherein Jackson alleged that upon the execution and delivery of the Quitclaim Deed, Laura transferred all of her title and interest in the residential property to him, and that he is therefore the fee simple owner of the residential property despite the inclusion of Laura on the Warranty Deed conveyed by Jeffrey. In the event that the district court determined the Quitclaim Deed failed to transfer all title and interest to the residential property, Jackson pled an alternative claim of unjust enrichment against Laura. The complaint also contained a breach of contract action against Jeffrey wherein Jackson essentially alleged that Jeffrey should not have included Laura as a grantee on the Warranty Deed when he knew that Laura had executed a Quitclaim Deed to Jackson.

In her answer and counterclaim filed on August 9, 2017, Laura denied that Jackson was the fee simple owner of the residential property, and raised several affirmative defenses (e.g., failure of consideration, undue influence, fraud, unclean hands, laches, and statute of limitations). In her counterclaim, Laura alleged that under the Warranty Deed, she and Jackson owned fee simple title in the residential property as tenants in common and she asked that title to the residential property "be quieted and confirmed" accordingly.

In his answer filed on August 9, 2017, Jeffrey denied that he was in breach of contract. On November 1, Jeffrey filed a motion for partial summary judgment, asking the district court to dismiss all causes of action against him. After a hearing, the district court filed an order on May 21, 2018, finding that Jeffrey had complied with the terms of the Land Contract. The court granted partial summary judgment in Jeffrey's favor as to all causes of action against him; causes of action against Jeffrey were dismissed with prejudice. That ruling is not challenged on appeal.

On May 22, 2018, Jackson filed a motion for summary judgment asking the district court to find in his favor with regard to his quiet title action against Laura. On May 23, Laura filed her own motion for summary judgment asking the court to dismiss all causes of action against her and to quiet title to the residential property in her and Jackson, as tenants in common, as requested in her counterclaim.

After a hearing at which evidence was received, the district court filed its order on September 7, 2018. The district court found that Jackson was entitled to fee simple ownership of the property. Accordingly, the court denied Laura's motion for summary judgment, and granted summary judgment in favor of Jackson.

Laura appeals.

## III. ASSIGNMENTS OF ERROR

Laura assigns that the district court erred in (1) granting summary judgment in favor of Jackson and quieting title to the property in his name only and (2) denying her motion for summary judgment and not adhering to the terms of the Warranty Deed and Security Land Contract and not quieting title to the property in Laura and Jackson as tenants in common.

## IV. STANDARD OF REVIEW

Summary judgment is to be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Wintroub v. Nationstar Mortgage*, 303 Neb. 15, 927 N.W.2d 19 (2019). Under an appellate court's standard of review, summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. See *id*. In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Id.*

The interpretation of a contract and whether the contract is ambiguous are questions of law subject to independent review. *Id.*

V. ANALYSIS

This quiet title action is brought pursuant to Neb. Rev. Stat. § 25-21,112 et seq. (Reissue 2016). Section 25-21,112 provides:

> An action may be brought and prosecuted to final decree, judgment or order, by any person or persons, whether in actual possession or not, claiming title to, or an estate in real estate against any person or persons who claim, or apparently have an adverse estate or interest therein, for the purpose of determining such estate, or interest, canceling unenforceable liens, or claims against, or which appear to be against said real estate, and quieting the title to real estate.

A party seeking to declare his title must rely on the strength of his own title and not the weakness of the title of others. *Dugan v. Jensen*, 244 Neb. 937, 510 N.W.2d 313 (1994).

Jackson claims, and the district court found, that he had and was entitled to "fee simple" ownership of the residential property. See, Black's Law Dictionary 648 (8th ed. 2004) (fee simple is also termed exclusive ownership); *Sterner v. Nelson*, 210 Neb. 358, 314 N.W.2d 263 (1982) (absolute title estate or property is fee simple estate; it is estate without end or limitations and largest estate person can possibly have).

In order to establish who has ownership of the residential property, we must establish the respective interests of Jackson, Laura, and Jeffrey as a result of various contracts and deeds relevant to these proceedings.

### 1. EFFECT OF 2009 LAND CONTRACT

As stated previously, on September 30, 2009, Laura and Jackson (who were in a relationship at the time) entered into a Land Contract with Laura's father, Jeffrey. Pursuant to the Land Contract, Jeffrey agreed to "sell and convey" to Laura and Jackson, as tenants in common, a residential property in Omaha. The pertinent terms of the Land Contract were as follows.

. . . .

**Section 3. PURCHASE PRICE.**

**3.1** The Purchaser agrees to pay to Seller . . . the sum of $79,200.00, to be paid in 119 equal monthly installments of $660.00 each commencing October 1, 2009, without interest prior to maturity, and a final installment of $660.00 on September 30, 2019. The entire unpaid balance of said principal sum, with interest thereon, shall be due and payable on September 30, 2019. . . .

**3.2** It is the mutual intention that the Purchaser shall take the Property free and clear of all liens and encumbrances existing as of the date hereof, except as expressly provided in Section 5 hereof, upon payment of the entire Purchase Price.

**3.3** Purchaser shall have the right to prepay all or any part of the principal balance of this contract at any time without premium or penalty.

. . . .

**Section 5. DELIVERY OF TITLE.**

Contemporaneously with the execution and delivery of this contract, the Seller has executed a general warranty deed (the "Deed") conveying to the Purchaser fee simple title

to the Property free and clear of all liens and encumbrances, subject only to the following permitted title exceptions [which are not relevant to this appeal]:

. . . .

The Deed shall be executed concurrently with the execution of this Agreement and placed in the possession and safe keeping of the Seller pending payment in full of this contract.

**Section 6. POSSESSION.**

Possession of the Property shall be delivered to the Purchaser on . . . the date of this contract. The Seller's interest in the Property is security for the payment of the balance of the Purchase Price owed by the Purchaser . . . .

. . . .

**Section 13. ASSIGNMENT BY PURCHASER.**

**13.1** The Purchaser may not assign this contract nor any of its rights and obligations hereunder without the prior written consent of the Seller.

. . . .

**13.3** In the event that Laura . . . and Jackson . . . should decide to part company and take up separate residences, Laura . . . may buy out the interest of Jackson . . . by payment to him of one half of the total amount of payments made by the Purchasers pursuant to paragraph 3.1 above. Upon payment to him of said sum, Jackson . . . agrees to execute and deliver a quit claim deed to the Property in favor of Laura . . . .

. . . .

**Section 15. GENERAL PROVISIONS.**

. . . .

**15.3** This contract is the entire agreement between the parties covering everything agreed upon or understood in the transaction. There are no oral promises, conditions, representations, understandings, interpretations, or terms of any kind as conditions or inducements to the execution hereof or in effect between the Purchaser and the Seller, except as expressed in this contract. No change or addition shall be made to this contract except by written supplemental agreement signed by the parties.

The Land Contract was recorded with the Douglas County Register of Deeds on October 28, 2009.

The effects of a contract like the Land Contract described above are clearly established in Nebraska law.

As in a mortgage, one selling under an installment land contract agrees to accept payments from the buyer, generally by a series of installments over time, until the purchase price as established by the contract has been paid. When the contract price has been paid, the seller must deliver a deed of title to the buyer. . . . Under such an arrangement, the seller retains the legal title as security for the deferred installments of the purchase price, and the buyer acquires equitable ownership of the property. . . . The net result is that the seller holds the legal title in trust for the buyer. . . . The buyer in possession, on the other hand, is, for all practical purposes, the owner of the property, with all the rights of an owner, subject only to the terms of the contract.

*Mackiewicz v. J.J. & Associates*, 245 Neb. 568, 573-74, 514 N.W.2d 613, 618-19 (1994) (internal citations omitted). See, also, *Wintroub v. Nationstar Mortgage*, 303 Neb. 15, 927 N.W.2d 19 (2019).

Further, the Nebraska Supreme Court has stated:

It has been frequently and consistently decided by this court, as it is quite unanimously agreed by courts generally, that if the owner of real estate enters into a contract of sale whereby the purchaser agrees to buy and the owner agrees to sell it and the vendor retains the legal title until the purchase money or some part of it is paid, the ownership of the real estate as such passes to and vests in the purchaser, and that from the date of the contract the vendor holds the legal title as security for a debt as trustee for the purchaser.

*DeBoer v. Oakbrook Home Assn.*, 218 Neb. 813, 816, 359 N.W.2d 768, 771 (1984) (quoting *Buford v. Dahlke*, 158 Neb. 39, 62 N.W.2d 252 (1954)). As such, an ""'"executory contract for the sale of land vests equitable ownership of the property in the purchaser, and . . . the seller retains the legal title as security for the deferred installments of the purchase price."'" *DeBoer v. Oakbrook Home Assn.*, 218 Neb. at 816, 359 N.W.2d at 771 (quoting *Buford v. Dahlke, supra*). "'Under a land contract, the vendee is the equitable owner of the real estate.'" *DeBoer v. Oakbrook Home Assn., supra*. When a deed is held in escrow until payment of the purchase price, "'the grantor of an instrument held in escrow loses control over it so long as the grantee does not default, even though he retains bare legal title in the land as security for the payment of the purchase price.'" *Id*. at 817, 359 N.W.2d at 771 (quoting *Beren Corp. v. Spader*, 198 Neb. 677, 255 N.W.2d 247 (1977)).

In this case, once the Land Contract was signed on September 30, 2009, and recorded with the Douglas County Register of Deeds on October 28, Jackson and Laura (as tenants in common) were vested with equitable ownership of the property, with all the rights associated with being an owner, except that Jeffrey retained legal title as security for the deferred installment payments of the purchase price. Jeffrey had no control over the land so long as Jackson and Laura were not in default. See *DeBoer v. Oakbrook, supra* (vendor has no control over land while deed in escrow and vendee not in default; vendor precluded from imposing new and additional restrictions upon land). Once the contract terms were paid, Jeffrey was required to deliver the deed of title to the buyers as tenants in common, which he did on June 22, 2017; the Warranty Deed was recorded with the Douglas County Register of Deeds on July 6.

### 2. EFFECT OF 2011 QUITCLAIM DEED

On October 12, 2011, Laura and Jackson signed an "Acknowledgment of Separation and Quitclaim" which stated in relevant part:

Laura and Jackson agree that Jackson will continue to reside at [the residential property], and that Laura, in consideration of ONE DOLLAR ($1.00) and other valuable consideration, receipt of which is hereby confirmed, is executing a quitclaim deed conveying and transferring whatever rights and interest she possesses in the [residential] property to Jackson.

Also on October 12, Laura executed a "Quitclaim Deed" which stated:

> Laura . . . GRANTOR, in consideration of One Dollar ($1.00) and other valuable consideration received from GRANTEE, JACKSON . . . remise, convey, release and quit claim to GRANTEE the following described real estate[.]
>
> [Legal description of property.]
>
> The Grantor hereby conveys and transfers whatever right and interest she acquired by reason of a Security Land Contract dated September 30, 2009[.]

This Quitclaim Deed was recorded with the Douglas County Register of Deeds on October 17, 2011.

"A quitclaim deed by its nature is an instrument of transfer whereby the grantor transfers only the interest the grantor has in the property at the time of the conveyance." *Gustafson v. Gustafson*, 239 Neb. 448, 451, 476 N.W.2d 819, 821 (1991). Additionally, "the distinguishing characteristic of a quitclaim deed is that it is a conveyance of any interest or title of the grantor in and to the land described rather than of the land itself." *Smith v. Berberich*, 168 Neb. 142, 146, 95 N.W.2d 325, 327 (1959). Accordingly, at the time Laura executed the quitclaim deed, she had the right to fee simple title upon payment of the purchase price and the right to a warranty deed being filed representing that. Thus, by executing the quitclaim deed, Laura transferred that existing right to Jackson, and she retained no further rights or interest in the property.

### 3. EFFECT OF 2017 WARRANTY DEED

There is no dispute that after the execution of the Quitclaim Deed, Jackson subsequently continued to make monthly payments to Jeffrey pursuant to the Land Contract. On May 31, 2017, Jackson paid the remaining balance of the purchase price under the Land Contract ($18,480). Once the Land Contract purchase price was paid in full, Jeffrey was required to deliver the deed of title. See *Mackiewicz v. J.J. & Associates, supra*. On June 22, Jeffrey signed the Warranty Deed conveying the residential property to Laura and Jackson, as tenants in common; the Warranty Deed was recorded with the Douglas County Register of Deeds on July 6.

Although Jeffrey did not sign the Warranty Deed until June 22, 2017, the Land Contract provided that, "Contemporaneously with the execution and delivery of this contract [dated September 30, 2009,] the Seller has executed a general warranty deed . . . conveying to the Purchaser fee simple title to the Property"; "the Deed shall be executed concurrently with the execution of this Agreement and placed in the possession and safe keeping of the Seller pending payment in full of this contract." The Land Contract was recorded with the Douglas County Register of Deeds on October 28, 2009. Under the terms of the Land Contract itself, Jeffrey was to execute a general warranty deed in 2009, and only keep it in "safe keeping" pending payment in full of the contract price.

Laura claims that the Warranty Deed executed in 2017 provided her with an interest in the residential property, "which could not have been previously transferred to Jackson by the Quit Claim Deed as a quitclaim deed does not convey after-acquired title." Brief for appellant at 9. We disagree with Laura's contention that the Warranty Deed provided her with "new rights that she did not have when she executed the quitclaim deed." *Id*. at 13. As stated previously, once the Land

Contract was signed and recorded in 2009, Laura and Jackson (as tenants in common) were vested with equitable ownership of the residential property. Although Jeffrey retained legal title as security for the payment of the purchase price, it was to be held in trust for Laura and Jackson, who were for all practical purposes, the owners of the property, with all the rights of an owner, subject only to the terms of the contract. See *Mackiewicz v. J.J. & Associates*, 245 Neb. 568, 514 N.W.2d 613 (1994). Thus, when Laura executed and delivered the Quitclaim Deed in 2011, she transferred all of her ownership interest in the residential property to Jackson, making him the sole owner of the property. This is not a case involving an after-acquired interest by Laura, and the fact that the Warranty Deed was not actually executed until 2017 is of no consequence for the reasons stated above.

At the time Jackson filed his quiet title action in July 2017, he was the sole owner of the residence. Thus, he was entitled to have title quieted to him, unless Laura raised a successful affirmative defense.

### 4. LAURA'S AFFIRMATIVE DEFENSES

At the district court level, Laura raised numerous affirmative defenses to Jackson's quiet title action. Although the district court did not specifically address Laura's affirmative defenses in its order, it would have necessarily determined the affirmative defenses lacked merit in order for the court to enter summary judgment in Jackson's favor. Further, on appeal, Laura only addresses three affirmative defenses: failure of consideration, fraud, and unclean hands. Thus, our discussion will be limited accordingly.

With regard to Laura's affirmative defenses, we initially note that Jackson claims Laura seeks to nullify the quitclaim documents via time-barred claims. He cites to *Becker v. Hobbs*, 256 Neb. 432, 438, 590 N.W.2d 360, 364 (1999), for the proposition that "'[a] counterclaim, setoff, or cross-petition, to be available as a matter of affirmative defense or affirmative relief, must be a claim upon which the defendant could, at the date of the commencement of the plaintiff's suit, have maintained an action on the defendant's part against the plaintiff.'" However, as Laura points out in her reply brief, the case cited by Jackson "deals with the timeliness of a counterclaim asserted by a defendant, not an affirmative defense." Reply brief for appellant at 7. Laura's counterclaim was only to have title to the residential property quieted to her and Jackson as tenants in common. Failure of consideration, fraud, and unclean hands were raised only as affirmative defenses to Jackson's complaint to have title quieted in him alone.

### (a) Failure of Consideration

Laura claims the "actual terms of the agreement between Laura and Jackson would need to be established in order for the court to determine the rights and obligations of the parties." Brief for appellant at 14. She cites to *Lindsay Internat. Sales & Serv. v. Wegener*, 301 Neb. 1, 917 N.W.2d 133 (2018), for the proposition that a failure of consideration means the contract is valid when formed but becomes unenforceable because the performance bargained for has not been given. She contends that if Jackson failed to make the payments as agreed upon between the parties, then the agreement "could be unenforceable because there was not proper payment of consideration." Brief for appellant at 15.

However, Jackson argues that the plain language of the "Acknowledgment of Separation and Quitclaim" shows that Laura expressly acknowledged receipt of full consideration owed by Jackson for conveyance of the Quitclaim Deed. The "Acknowledgment of Separation and Quitclaim" stated in relevant part:

> Laura and Jackson agree that Jackson will continue to reside at [the residential property], and that Laura, in consideration of ONE DOLLAR ($1.00) and other valuable consideration, *receipt of which is hereby confirmed*, is executing a quitclaim deed conveying and transferring whatever rights and interest she possesses in the [residential] property to Jackson.

Jackson asserts that Laura is attempting to introduce extrinsic evidence to invalidate the quitclaim documents, specifically, that Jackson did not pay her the additional sums she claims are owed. He cites to *Summer Haven Lake Assn. v. Vlach*, 25 Neb. App. 384, 905 N.W.2d 714 (2017), for the proposition that extrinsic evidence is not permitted to explain the terms of a contract that is not ambiguous. He claims that Laura's assertion that "the consideration paid was not the full amount owed pursuant to a prior, oral agreement, is in direct opposition with the plain language of the quitclaim documents and the rules for interpreting such contracts under Nebraska law." Brief for appellee at 11.

In her reply brief, Laura cites to *Irwin v. West Gate Bank*, 288 Neb. 353, 848 N.W.2d 605 (2014), to support her claim that extrinsic evidence is allowed to explain the consideration for the contract in the instant case. In *Irwin v. West Gate Bank*, the document at issue provided, "'For good and valuable consideration, the receipt of which is hereby acknowledged. . . .'" *Id.* at 354, 848 N.W.2d at 607. There was later a claim of lack of consideration and that the contract was unenforceable. The Supreme Court said:

> Lack of consideration is relevant to whether the parties have formed an enforceable contract. . . . We have approved the proposition that "consideration is an essential element to the validity of a contract." . . . Actual consideration is therefore relevant to whether an enforceable contract was formed.
>
> We have long observed: "'That the contract was lacking in consideration from its inception may be shown by extrinsic evidence, providing the proof thereof does not contradict or vary the contractual consideration named in the written contract . . . .'" . . . *A statement that consideration for a promise was received is a statement of fact, not a term of the contract. As a statement of fact, it may be explained or contradicted by extrinsic evidence. . . .* "[A] mere pretense of bargain does not suffice, as where there is a false recital of consideration or where the purported consideration is merely nominal. In such cases there is no consideration . . . ."

*Id.* at 360, 848 N.W.2d at 610 (emphasis supplied).

However, *Irwin v. West Gate Bank, supra*, dealt with a lack of consideration and whether or not an enforceable contract was even formed. That is not the circumstance present here. Laura never claimed there was a lack of consideration. See *Schuelke v. Wilson*, 255 Neb. 726, 735, 587 N.W.2d 369, 376 (1998) ("[g]enerally, sufficient consideration for an agreement will be found if

there is some benefit to one of the parties or a detriment to the other"). The evidence clearly showed that consideration ($10,000) was actually received in exchange for the quitclaim documents. Jackson argues that "$10,000, as a matter of law, is not considered nominal consideration and clearly provided a benefit to Laura." Brief for appellee at 14. We agree. The principles related to lack of consideration are inapplicable to the circumstances present here.

However, as previously noted, in her argument related to her affirmative defense for failure of consideration, Laura cited to *Lindsay Internat. Sales & Serv. v. Wegener, supra*, which distinguishes a "lack of consideration" from a "failure of consideration" and provides clarity between the two concepts. "'A lack of consideration means no contract is ever formed because no consideration exists or none was intended to pass.' . . . A failure of consideration, on the other hand, 'means the contract is valid when formed but becomes unenforceable because the performance bargained for has not been given.'" 301 Neb. at 10, 917 N.W.2d at 141 (internal quotations omitted). Laura's affirmative defense was based on a failure of consideration, meaning the quitclaim documents were valid when formed, but allegedly became unenforceable because the performance bargained for had not been given.

The problem with Laura's failure of consideration argument is that she signed and delivered the quitclaim documents, both of which acknowledged or confirmed her receipt of the consideration given to sign such documents. And where a grantor executed a deed and made a valid delivery, he or she cannot subsequently, by withdrawing or destroying the deed, or by other acts indicating a subsequent change of intention, affect the transaction thus completed. See *Kramer v. Dorsch*, 173 Neb. 869, 115 N.W.2d 457 (1962). Laura executed the Quitclaim Deed and delivered it to Jackson; if she had not received all sums due to her, then similar to other mortgagees as discussed earlier, she could have retained possession of or placed into escrow the Quitclaim Deed until the contract terms had been fully paid, at which point she would then deliver the deed of title to the buyer (Jackson). See *Mackiewicz v. J.J. & Associates*, 245 Neb. 568, 514 N.W.2d 613 (1994). Instead, Laura executed and made a valid delivery of the Quitclaim Deed to Jackson, thus completing the real estate transaction. See *Kramer v. Dorsch, supra.*

Further, to the extent Laura had not been paid in full based upon her understanding of an oral agreement she had with Jackson, there is nothing in writing to support her claim. The quitclaim documents were the only written documents related to the sale of her interest in the real estate and those documents acknowledged her receipt of consideration from Jackson. The statute of frauds provides that "[e]very contract . . . for the sale of any lands, shall be void unless the contract or some note or memorandum thereof be in writing and signed by the party by whom the . . . sale is to be made. Neb. Rev. Stat. § 36-105 (Reissue 2016). An oral contract to buy land falls under the statute of frauds, although an oral contract may be enforced in cases of part performance. *American Central City v. Joint Antelope Valley Auth.*, 281 Neb. 742, 807 N.W.2d 170 (2011). Part performance was not an issue in the present case, thus, any oral agreement related to Laura's sale of her interest in the real estate to Jackson would fall within the statute of frauds and would be void. Further, a "mere breach or violation of an oral agreement which is specifically covered by the statute of frauds by one of the parties thereto or the mere denial of an agreement or refusal to perform it is not of itself a fraud either in equity or in law for which the court should give relief." *Farmland Service Coop, Inc. v. Klein*, 196 Neb. 538, 543, 244 N.W.2d 86, 90 (1976). There are

no material issues of fact as to Laura's affirmative defense based on failure of consideration which would preclude entry of summary judgment in Jackson's favor.

(b) Fraud

Laura pled that the Quitclaim deed was void due to fraud. Generally, in the absence of fraud, one who signs an instrument without reading it, when one can read and has had the opportunity to do so, cannot avoid the effect of one's signature merely because one was not informed of the contents of the instrument. *Cullinane v. Beverly Enters. - Neb.*, 300 Neb. 210, 912 N.W.2d 774 (2018). However, this rule applies only in the absence of fraud or an inability to read. See *id*. Laura did not plead a specific type of fraud, but her argument on appeal identifies the elements for fraudulent misrepresentation.

A fraudulent misrepresentation claim requires a plaintiff to establish the following elements: (1) A representation was made; (2) the representation was false; (3) when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) the representation was made with the intention that the plaintiff should rely on it; (5) the plaintiff did so rely on it; and (6) the plaintiff suffered damage as a result. *Cullinane v. Beverly Enters. - Neb., supra*. A plaintiff must show that the defendant intended the plaintiff to rely on a false representation; whether a party's reliance upon a misrepresentation was reasonable is a question of fact. *Id*. In a fraud case, direct evidence is not essential, but proof of fraud drawn from circumstantial evidence must not be guesswork or conjecture; such proof must be rational and logical deductions from the facts and circumstances from which they are inferred. *Id*.

In support of this affirmative defense, Laura contends only that "Jackson told her that he would pay her $15,000 but did not state so in the Quitclaim Agreement for tax purposes," that she "relied upon that representation when executing the Quitclaim Deed and Quitclaim Agreement, and suffered the potential loss of her interest in the Property and payment of an additional $5,000." Brief for appellant at 18. Laura does not assert that any representation made by Jackson was false or that the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion. In her deposition testimony, Laura stated that she had an opportunity to read both documents before signing, and when she asked Jackson why the documents said "this dollar thing" and not $15,000 like they agreed upon, Jackson told her it was "'not a big deal, it's just so that we don't have to pay taxes on it.'" The evidence indicates that Jackson merely provided an explanation for why the quitclaim documents refer to one dollar "and other valuable consideration," rather than any amount the parties may have agreed upon. Such an assertion does not meet the elements of fraudulent misrepresentation.

Laura stated, "I remember Jackson and I discussing that he pay me a lump sum. He had me add up everything that I could think of up to that point which I know came out to anywhere between 18,000 and 20,000." "[He] said that was too much money, that he didn't have that, and so I rounded down for him. I rounded down to [$15,000]," "and he agreed upon that." The agreement was "[m]aybe about a month, month and a half before [the quitclaim deed] was signed." She said that Jackson gave her $1,000 around the time of their discussion, and then $9,000 later. Laura said Jackson told her it would take him a couple years to give her the other $5,000. Laura acknowledged that she did not have any documents or written records showing the $15,000 amount allegedly

agreed upon. Even viewing the evidence most favorably to Laura, the facts do not support a claim of fraudulent misrepresentation.

### (c) Unclean Hands

Under the doctrine of unclean hands, "a person who comes into a court of equity to obtain relief cannot do so if he or she has acted inequitably, unfairly, or dishonestly as to the controversy at issue." *Farmington Woods Homeowners Assn. v. Wolf*, 284 Neb. 280, 289, 817 N.W.2d 758, 767 (2012). "Generally, conduct which forms a basis for a finding of unclean hands must be willful in nature and be considered fraudulent, illegal, or unconscionable." *Id*.

Laura's arguments for unclean hands relate to the purpose of the Land Contract (e.g., that Jeffrey transferred the property to Laura and Jackson under favorable financial terms, that Jeffrey wanted Laura to have the property if she and Jackson broke up, and that Jackson took advantage of an opportunity that was not meant for him). Laura was well aware of the purpose of the Land Contract at the time she quitclaimed her interest in the residential property to Jackson. Following the quitclaim deed, any potential breach of the provisions in the Land Contract allowing for Laura to buy out Jackson's interest in the property, and prohibiting the purchaser from assigning the contract or any of its rights without Jeffrey's consent, would have to have been brought by Jeffrey. However, as noted earlier, Jeffrey did not raise a breach of contract claim at any time prior to receiving full payment on the Land Contract (and signing of the Warranty Deed), even though the evidence showed he was aware of the Quitclaim Deed between Laura and Jackson. Thus, Laura's claim of unclean hands, as it relates to arguments about the purpose of the Land Contract, fails.

Laura also alleges that Jackson has unclean hands because of the additional $5,000 that Jackson allegedly still owes her, and her allegation that the only reason the $15,000 amount was not stated on the documents was because Jackson said it was so they did not have to pay taxes on it. As we stated in our discussion related to Laura's fraud claim, this evidence indicates that Jackson merely provided an explanation for why the quitclaim documents refer to one dollar "and other valuable consideration," rather than any amount the parties may have agreed upon. Conduct which forms a basis for a finding of unclean hands must be willful in nature and be fraudulent, illegal, or unconscionable. See *Farmington Woods Homeowners Assn. v. Wolf, supra*. Jackson's explanation did not constitute fraudulent, illegal, or unconscionable conduct. Again, construing the evidence most favorably to Laura, this affirmative defense fails.

### VI. CONCLUSION

For the reasons stated above, we affirm the decision of the district court granting summary judgment in favor of Jackson and denying Laura's motion for summary judgment.

AFFIRMED.